Good morning. Good morning, and may it please the Court, I'm Lori Ashton, in the Color Board Act, on behalf of the Republic of the Marshall Islands State College. Your Honors, the political question doctrine applies to policy choices and value determinations that are not the only nature. And at the core of this case is a dispute over the nature and purpose of the legal obligation to pursue negotiations in good faith under Article 6 of the Brown Corporation Treaty. And the defendants admit that this treaty is a, quote, legally binding instrument. What we've fled and what we know from the legislative history and the drafting history of this treaty, is that once it was ratified, it became an inescapable, unqualified, unequivocal, binding, legal commitment that certainly became the law of the land. None of these words signify a non-legal, discretionary value judgment. And it is the judiciary, and not the executive, that says what the law is. Under Count 1, we ask the Court to interpret the non-proliferation treaty. We ask the Court to interpret this legally binding instrument and describe the nature and scope of the duty to negotiate. Therefore, it cannot be, as the order below would have it, that the legal ruling of this treaty sought in Count 1 is subject to redetermination at will by non-Article 3 officers of the executive. Counsel, is that making everything that you said about the treaty being the law of the So, what's the legal obligation here that is called out that you think we are capable of enforcing? I know you can tell me Article 6. I'll tell you what in Article 6. Right. Creating a legal obligation that you think that we can enforce. Right. Because there are marks of the obligation that would be subject to discretion. But what we've fled are only objective breaches of that obligation. Let me tell you what the objective obligation is to negotiate the executive notice. Can you refer to Article 6? Exactly. You're talking about language in Article 6. It is the obligation to negotiate in good faith. Those four words have a legal meaning. Yep. But before that, the language is undertakes to pursue. Right. It's a very, very general sort of preparatory language. I see. I see. Okay. So, we cite the court, the Serbia genocide case, an international case from the International Court of Justice, that describes that the word undertakes is a word that's commonly used in treaties. And the parties have known for quite some time what it means. And it is a binding promise to undertake. It is unqualified. It is not purgatory. Do we get, are you suggesting that this case goes forward, that we get to sort of, that we get to ask the executive to open its files to find out whether there's a memo from the Secretary of State that says she had talks with talks with the Soviet Union prior to 1889, and they weren't interested in coming to Geneva. We called India and Pakistan in 1992, and they weren't interested either. I think it's possible that there would be some evidence that is not accessible under doctrines such as the Act of State. But I think that the answer to your question depends on how the court interprets the nature and scope of the duty to negotiate in this case. What if we were issuing sanctions against the executive locally, who, what would we tell them to do? Right. To undertake, to pursue. Right. The word undertakes, as I stated, has a legal meaning in treaty law. So, it means binding unequivocal promise. So, if you order a treaty, did you have to satisfy your binding and unequivocal promise to negotiate in good faith? No. In other words, you have to abide by the treaty. Will we basically say abide by the treaty? Isn't that the essence of what you just said? I mean, what's the difference between saying, well, we order you to undertake good faith negotiations, or you're basically saying we should issue a either declaratory judgment or injunctive release that basically says to the U.S. government, which is the executive, get with it under the treaty, under this premise. Right. I think before we get to the injunction, we have to define the nature and scope of the duty. For example, we have a very basic dispute with the executive over whether this treaty should attend negotiations. So, for example, as we pled with the 190 nations that are party to this treaty, only four of them voted to not attend negotiations, and the United States refuses to attend negotiations, has never attended negotiations. So, that's a very basic dispute over an objective matter. Okay. So, basically, even though the Constitution generally leads to the executive, its execution under the treaties, we would be ordering the executive to attend negotiations. Is that one of the things? That is one objective factor under the nature and scope of an obligation to negotiate in good faith. There are others. Is there a, there's not a fixed box of what negotiating in good faith means, is there? There's not a fixed box. Well, what we studied at the court, too, were examples of From labor law. Not just labor law, also from the states' obligations to negotiate with Indian tribes, also from states' obligations to negotiate the continental shelf, and also the international case law on what that duty means. And in all of those settings, there were not factors in a box that told us what the duty means, but they are all consistent in what the duty means, because this phrase, negotiate in good faith, has a legal meaning. Well, can I ask this? This was decided on a motion to dismiss, and if this panel were to say, we're going to reverse it and remand to get a fuller record, full record, would you expect to be able to collect, so this leads to what Judge Bidey was asking, are you going to go and get papers from presidential libraries, and you know, I mean, what are people who have been signed or drafted by people who are dead, you know, President Johnson is dead, President Nixon ratified, he's dead, probably most of the senators who voted on this, this was a 1970 document, so they're dead. What is it that if we did say, go and get us a fuller record so we understand what was intended, what would you trust? I think the answer to your question has at least two parts. First, as with any law where the folks who passed it are no longer with us, we have to look at the legislative history. We have to dig into that. We cited several sections in our complaint and in our briefing that tell us that once the treaty was ratified, the obligation to negotiate was unqualified, it was inescapable, unequivocal, binding, and legal. So, that has not been controverted by the executive here. My question was, what more would you give us? If we did send it back and said, get a fuller record, what would be the fuller record? I understand you gave us some things. Right. So, I think the point your question is getting at is quality of negotiations. You like documents when we get to show you, trying to figure out, right, the record we most are going to get, the best we're going to get on the issue of, you know, what really are people thinking of? Are they thinking this would be a self-executing treaty? For example, I want to know if it's possible that there would be a better record than we have. And if so, what is it that would make it better? On the issue of self-execution, that is really a separate issue that I'd like to answer. It's a very important issue to me. So, if it were to go back, I would expect a fuller record, if such is available, on whether this treaty was intended to be self-executing or not. And if so, tell me what I might expect to get more than I have now. In terms of legislative history, I don't know what more you will get. I think we have combed it thoroughly and cited the references to the nature of the obligation. In terms of whether it is self-executing, though, the Medellin case is important here. It tells us that an obligation in a treaty that becomes operative without legislation, if it can become operative, then it has the force and effect of a legislative act, okay? So, this was an obligation on the executive, which even the other side would agree. He's offered it without Congress. Congress does not have a right to tell the executive when and how to negotiate it. So, the obligation in the treaty, along with the legislative history we've cited, demonstrates that this became operative right when it was ratified. Then let's get into Medellin, because inevitably we need to take a close look at that. So, there's some language in Medellin with respect to the domestic effect. And in particular, I'm looking at language that basically takes similar promises you have here, but then characterizes it as essentially this compact between independent nations. And then ultimately says it relies on the honor of the governments which are party to it. What do you make of that language with respect to our ability to actually order something here? Right. Several points on Medellin. First, this was in the context of whether the treaty was operative for third parties to bring treaty claims. So, it was not a case between treaty parties. In fact, there is no case suggesting that a treaty party does not have rights immediately. So, even if you were to find, which I don't think can be found at this point, that the treaty was not operative domestically, even if you were to find that, there is no dispute that it is operative internationally. In fact, the defendants agree that it is a binding legal obligation. So, that makes it different right there for Medellin. We have treaty parties. Secondly, that is actually what Medellin says ordinarily. And I would submit to the court that it says ordinarily because sovereign immunity is rarely waived and because foreign nations rarely come into our courts, submit themselves to the jurisdiction of our courts for this type of dispute. This is a rare occurrence. And I said it to Professor Kamrosch on this point in the briefing. I'm still trying to figure out what part of this thing is. I'm still trying to figure out what you want us to order the executive to do. Is it to pursue negotiations? And then a separate part would be, can you tell us whether the negotiations were conducted in clean faith? The first part is, do we order them to pursue negotiations? To pursue negotiations in clean faith. So, are we instructing them to begin to pursue negotiations? I mean, are we instructing the Secretary of State to call somebody? Are we instructing them to attend a meeting that's previously been established by other negotiating parties? It could take either form, Your Honor. I think the first step is to define what the nature and scope of that duty is. Well, that's what we're asking. So, to comply with your obligation to negotiate in good faith, you have to show up. And the United States has never once shown up in such a way. So, we clearly would order the United States, through some representative, the executive, to show up and negotiate. I can hear people saying that it's in March. That's not true. Approximately every year since 2012, there has been a vote in the U.N. to begin negotiations on nuclear disarmament pursuant to this treaty. The United States votes no, does not attend those negotiations, and puts out a statement saying we're not going to accept anything that happens in those negotiations. So, once you define the duty as at least saying you have to show up, which has never happened, then you can decide the scope of the injunctive relief. So, basically, just to be clear, there would be an injunction or directive to show up at the negotiations, not to say what you would say when you get there? Certainly not to say what you would say. But at the very least, we would instruct them not to vote no the next time the treaty comes up with the United Nations. I'm not sure you would have to say that they can't vote no, but they would have to attend. So, for example, there were a few countries that voted no and attended and participated. So, in other words, the objective criterion, if we're boiling it down to the easiest and simplest criterion, is that to satisfy this legal obligation, you have to show up, and they have never shown up. I wanted to reserve some time for rebuttal, but I also wanted to answer for the Court any issues you might have on Earth Island. My question really goes to the whether it's self-executing or not. And so when we're analyzing need, let's assume that it's not self-executing, just for purposes of talking. Where does that fit, either in the regressibility analysis or the other construct in which we look at the case? You want me to assume that it is not self-executing? Is that the question? If I assume that, then does it face a binding legal international obligation? And we are here on that obligation. If you assume that it was not operative domestically on ratification, which we would argue is contrary, if you assume that, we are here on a binding international obligation. But what role would self-executing play? Because virtually every... I mean, you basically collapsed self-executing and non-self-executing. I'll give you this finished question unless you have an answer before I finish. But essentially, we've made that distinction in the law. And if I take your point, then that distinction becomes irrelevant because every treaty has this overarching relationship between country A, B, or C. The answer to that lies in the fact that the self-execution doctrine has only ever been applied to third parties. And an international obligation doesn't help a third party because the third parties that have been before the courts are there under domestic criminal law. So it does not help them. It's never been extended to treaty parties. And the reason why it wouldn't is because even if it were not operative, which I claim strongly it is, but even if it were not, we have an international obligation that we can bring before you. So if you're right that this duty to negotiate good faith relationships is in all kinds of treaties, you know, trade treaties or any other treaties, it would basically mean that all of these treaties would be subject to the jurisdiction of the court without political question or any other disqualifying doctrines and then a court could direct the executive to get on board with the terms of those treaties and where we would be left. If there are objective criteria not being met, yes, which is all that we've planned. We have certainly not planned subjective criteria. I would reserve the remainder of my time for rebuttal. All right. Thank you. Thank you. What does this mean, please, the court? There are a lot of complicated international law and international law concepts involved in this case. Before we unpack them, it's important to emphasize one important point, which is that the extraordinary nature of the relief that the Plaintiff for Public Martial Violence is asking for here. I mean, a foreign sovereign is coming into a federal court and asking for a declaration that the United States is in violation of its international treaty obligations and also to compel the United States to initiate negotiations with other sovereign states. That raises obvious jurisdictionality concerns and jurisdictional problems which we address in our brief. The most obvious one being that the decision-making about when and how and in what context and what time the president, the executive, will initiate treaty negotiations with other sovereign nations is constitutionally committed to the executive branch. It would also, with the relief that the plaintiffs are seeking, goes against over 100 years of Supreme Court precedent and the precedent of this court saying that they have international legal norms, long-standing legal norms, that say that when two sovereign nations have a dispute about what treaty provisions mean or when one of them is in compliance, the way that they resolve that dispute is with recourse to international remedies and not by suing each other in their domestic courts. The Plaintiff says that we have conceded that there is a legally binding obligation. What they do not add is that it is a legally binding, it is an international obligation. Treaties bind the nations together with international obligations and then they contain whatever dispute mechanisms the parties agree upon. So if you look at this treaty, there is no provision for domestic enforcement of the treaty. There is no provision for going into the sovereign nations' domestic courts. In fact, this goes to your question, Your Honor, about whether or not this is a self-executed treaty under Medellin. So that is one thing that the parties agree upon. Medellin is controlling here. It is the Supreme Court's most full, recent explanation of how you determine that a treaty is self-executing. And what the Court said was, if it is not self-executing, then it does not have domestic legal effect. And the way that you determine this is you look first and foremost at the intent of the President and the Senate. Because self-executing versus non-self-executing, this is a domestic law clause, not an international law clause. Yes, Your Honor, I stopped you there just to put some context in as you go forward. One of the arguments made is that Medellin came up in the context of a third party and that the concept of self-executing versus non-self-executing treaties actually is not really tested in the case where you have two treaty parties in a country position to each other. Well, the reason for that is that every party that agrees to come before the courts has to have a cause of action. And as we point out in our brief, we are here because this is a non-self-executing treaty and there does not happen to be any implementing legislation. There is no legislation that actually gives anyone, including a foreign sovereign, a cause of action to come into court. Do you have to have it? The courts have said, across the exceptions, that even a foreign sovereign needs to have a way to get into court. So if you look at Pfizer versus India, which the plaintiffs rely on, there the question was did the antitrust laws of the United States, was the way that the cause of action was defined so as to encompass allowing the foreign sovereign to file suit and the determination was that it did. But a foreign sovereign would have to have a way to get into court. Well, often when we make a distinction, of course, between jurisdiction, which we often look at and go to motions to dismiss, and the cause of action, are we in a situation under your argument where the cause of action collapses somewhat into addressability? I mean, where does it fit here? Well, the way that we briefed you, it follows as a consequence of the determination that this is not a self-executing treaty. Because it is a non-self-executing treaty, it has no domestic legal effect. There is no implementing legislation. There is nothing. There is no statute. There is nothing that actually gives them the right to come into court. They have proposed that they can come into court directly on the treaty, but there is really no precedent for that. You have to have a cause of action. The APA, if we run through the APA, would not give them a cause of action. They do not actually invoke the APA for that purpose. The Tucker Act would not give them a cause of action, although they try to cast this as a type of a contract action. In fact, the Tucker Act would decry it. There are a lot of limitations on bringing a contract action against the United States. You cannot get money damages. You can't get an incentive to court declaratorily. You definitely cannot get specific performance. And, in fact, I know people would not be to this court. It would be to the filibuster. Right. So it isn't that. So they don't actually identify in any way anything that gives them a cause of action, and that's why you haven't seen a lot of other sovereigns come into court. And also, to determine whether, you know, to kind of contest if a treaty is self-executing or non-self-executing. I mean, again, it is not something that other sovereigns would necessarily come into court to contest because it is a domestic law concept and because traditionally what sovereigns do is they take their disputes, they do something that you can't actually see here. So it wouldn't come into contestant, but the United States would raise it. I mean, that's how it would come up. Right. You're right. I can't even think of any cases in which, it is hard to think of cases in which a foreign sovereign has come into court, period, about a treaty or about anything else. It usually is in commercial context, such as the Pfizer case. What if it is self-executing? No, you're right. What if it is self-executing? Where does that leave you? Even if this treaty were self-executing, that would not affect the standing and political question problems. Those apply regardless of the status of the treaty. Folks, public parties and states have to comply in order to be self-executing. Well, I would be speculating, Your Honor. I would say. I'm asking you to speculate. Yes. Let me tell you what it would be more. If, for example, each signatory to this treaty shall attend the United Nations Conference on Non-Proliferation in Geneva's State Building for every March, shall set the delegation with that, and these are undertaken to negotiate a good, good equivalent, they shall at least attend that peaceful conference in Geneva. Your Honor, that's a difficult question, because if you look at what Payne asks, does he contemplate further action? That would still contemplate further action. So I would contrast, for example, with, for instance, an extradition treaty. But it might at least create a legal obligation to attend something. An international legal obligation, which is what you have now. But if I can contrast, for example, with an extradition treaty now, of course every treaty is different and it depends on the language, but typically extradition treaties are female self-executing. And if they set out standards, they will say, for instance, X, Y, and Z criminal offenses are covered by the extradition treaty. And then that can serve as a rule of decision. So, and the same for the treaties on inheritance rights for individuals. So those also typically are viewed as self-executing. They don't contemplate further, require further action by any signatory parties. Here, if we want to look at what evidence we have, you ask what evidence more can be produced, we have all the evidence we need to make a decision. So we have, you know, the legislative history, which is the impression that the consumers know. Sometimes the Senate nowadays includes a statement when it provides advice and consent to ratification. There's no statement. There was no statement by the President in connection with ratification. There was nothing that indicated that people were thinking that this was going to be domestically enforceable self-execution. And what you have instead are a number of different statements which we'll talk to in our brief in the section on self-execution. By Senator Fulbright, who was the chairman of the Senate Foreign Relations Committee, and he was responding to a number of different questions. A number of senators were concerned what would happen if Congress passed a law that appeared to contravene this entity treaty. And repeatedly he told different senators that it would not, he did not regard it as a solution. If Congress passed a law that said no funds would be allocated, we've created all these funds to go to the State Department, but no funds shall be allocated for the purposes of attending the United Nations Conference on Nuclear Proliferation in Geneva in March, would that create a problem? I don't know if a funding bill would simply zero out funding for that. I'm not sure what kind of problems that would present. We can say, because we know this from the Earth Violent Institute case, that you cannot have a statute, for instance, that says the Secretary of State will negotiate about, in that case, if you see turtles. Because when a plaintiff tried to enforce that statute, this court said, no, you cannot do that. That is committed to the executive order. So I think the answer, one of the answers to that is, we're not asking for something as anodyne as negotiating, we're just asking to show up. I think that was one of the things that she had said, the duty is must attend. So it's the, let's say, the only duty they're asking for us to consider here is that the United States must attend these sessions. Again, Your Honor, we have to look at what they actually asked for in their complaint, and that was to call for and convene negotiations on effective measures leading to the cessation of the arms race and nuclear disarmament. And it is basically, it is asking for an order directing the time, place, manner of when these negotiations will take place, and that is exactly what is committed to the executive order. So there'd be an interruption in the negotiations after the treaty was We have strong disagreements with the plaintiff. Yeah, I'm just asking a simple question. You should know this, Your Honor, for any of these conventions. In fact, Your Honor, every five years, this is set out in the treaty itself, every five years there is a review conference, and the review conference, all of the parties meet. And the U.S. has attended these? Yes, all of them. There are additional meetings. As she said, every year or two, they're on top of that. There are meetings, I think, every couple of years, by what's called the P5, and this is against the nuclear weapon states, who are parties to the treaty. The United States does nothing but attend meetings. But that is apparently not sufficient for them, because they want a particular content. They want a particular result. They want good faith. They want good faith at the front. Should the administration issue a statement with regard to Article VI, saying that we won't do something, or that it's not feasible to do something, or that it's unavailable to do something, and therefore there's no reason to do it in the future? Your Honor, I do not know that that's what I know. There's a bit of a record that administrations, whether Democratic or Republican, have tended to treat their obligations under this in the same way. That is correct. And also there is a statutory obligation on the part of the Secretary of State, I believe, to certify over here whether or not the United States is in compliance with the treaty. And I believe it has been. That has been the case. There has been this certification. That is another problem that comes up in the context of the question. We already have the United States speaking on that point, that it is in compliance. And what the plaintiffs are saying is, no, we want you. We disagree with that. And we, in fact, that is unsatisfying. And you need to comply in a different way. And you end up with that gets me into the political question issue. And of course, we always have difficulty when Supreme Court uses factors, or we make a factor test. One of the key factors in these, in treaty and other foreign relations cases, is that they involve some sort of a sensitive foreign policy issue. And so that's what we're usually looking at. But as I understand it in the district court, the government is that that factor is not in play here. Is that right? The discussion of that in the plaintiffs' papers is not entirely accurate. If one looks at the entire colloquy with trial counsel, you will see that what he was actually saying was the fact that we are not relying on the fact alone that it's a sensitive, that this implicates sensitive foreign policy questions. It is not a per se, therefore there is a political question. He isn't ruling out that it's part of the analysis. Because of course, it goes without saying that the content of negotiations, the determination of when they should take place, whether there should be bilateral negotiations that take place separately, whether there are other issues you want to address with the other nuclear weapon states before you take this on, whether you need to create a context for all of these other kinds of things that the executive branch must consider in its decision making. It's a very nuanced determination. And so you're basically saying that in the Baker analysis, you would include these foreign policy considerations as one of the reasons that it's not just a simple rule. Well, I would certainly say that there are decisions that say, just the fact that it involves foreign affairs, that's good enough. But what we're saying is it isn't just that. It's that the question about can all these negotiations take place, this really is a textual commitment to the executive. There is historical gloss on articles of powers saying that the president, the executive, has to speak with one voice in conducting diplomatic relations, in conducting these negotiations. And so it isn't simply that it involves foreign affairs. It is that there is a whole package here. And also, to get into, I don't have enough time to talk about very briefly the absence of any managerial standards on the number of your questions. It seemed to me to raise that problem that the district court would have to evaluate, just looking at the text of Article VI, what does it mean under case to pursue? What does it mean to pursue? And what kind of negotiations are sufficient negotiations? So yes, there are provisions of the treaty that might be self-executed, but only the provisions might not be self-executed. So under Article I, each nuclear weapon is imparted into the treaty, and there keeps an option to transfer 20 recipient ones over nuclear weapons. Is that something sufficient? Your Honor, I have to admit... You have to transfer nuclear weapons to another country. I have to admit, Your Honor, that although I've read the entire treaty, we did not focus on whether that portion was self-executing. So all I can speak to is whether Article VI is self-executing. We believe it is not. There were... The plaintiff has also made some good faith in the argument that this court should resort to relying on cases under the Indian Paving Regulatory Act, as we believe in the NLRA. Those statutes, which contain that standard, they actually have some provisions that give content to the standard, and that brings me back to the fact that here, we do not have a statute. It is in the absence of a statute that makes the distinction. And in fact, that is a distinction in many of the cases on which the plaintiff relies, in which the Supreme Court did not find that there was a political question. So for instance, in Jamaica Whaling, the court said, this is simply a constrained statute, or as in Petovsky, on which the plaintiff relies, the court said, there's a statute, and we can construe it. And it is significant that in Petovsky, when the court went on to construe the statute, when it returned to the Supreme Court, the Supreme Court said, well, this would violate the clause about recognizing foreign elements, and so it cannot be enforced. So, which is essentially, you know, what we're saying here, is if there were a statute, it would not be able to enforce it. Just as I so refer to, is that aspect of the Baker criterion of lack of medical standards tied in then to execution, self-execution, in your view? Even if, Your Honor, I think even if it were a self-executing statute, even if it created, if it were to provide a, if it did have legal effect, you would still have this problem, you would have a treaty with legal effect, but no standards. And that goes back to the, I think we're kind of talking to a degree past each other, between the parties, because they say, yes, it does have legal effect, and you say, well, yes, it does in the international arena, but not in the domestic arena, so we're looking each side and saying, it has legal effect, and if it has legal effect, the U.S. courts can interpret, well, what does that statute mean, or what does the treaty mean? Well, so let's say that they, I see my time is up, but if I can answer this question, so let's say that they actually did pursue international remedies, and it has, in fact, they have, they've gone to the international court of justice. I do not think they have received a satisfactory response from the international court, but let's say that all the parties were hypothetically committable to jurisdiction, and this question went before the court, the international court of justice could look at its past cases, which are not precedent in and of themselves, but they could look at those cases as to how it is interpreted in an international context and good faith complication, right? So there it's relevant, but it is not relevant domestically. Right here, what they are pointing toward is a case law involving a good faith obligation that specifically drives the statute, which gives it content, and here we don't have anything domestically that is giving content to this treaty, to those words in this treaty, so it would be an unmanageable standard. It would involve a lot of guesswork and a lot of talk about very subjective evaluation on issues that are committed to the executive branch and are very nuanced. I mean, it would be a very blunt instrument to take the NLRA standard and try to use it in the context of diplomatic negotiation, and what is acceptable. Thank you. Thank you, Your Honor. We ask you to pass the court order. Thank you. Your Honor, when treaty parties want to exclude resort to outside jurisdiction or limit recourse to negotiations, they do that with language in the treaty. For example, in the NATO SOFA treaty that is referenced in the Holmes v. Laird case that is in the parties' briefing, the 1951 treaty, they have a provision that says all differences between the contracting parties relating to the interpretation or application of this agreement shall be settled by negotiation between them without recourse to any outside jurisdiction. That's how treaty parties preclude outside jurisdiction when they choose to. That's what she wants. That's what you're saying? No, I'm distinguishing this clause from a self-executing analysis which has never been applied to a treaty. Well, all that does is basically give you, in effect, what she was referencing, is it gives you a standard for resolution in the international context, doesn't it? It gives you at least that. I would submit to you that any holding saying that the executive's obligation to negotiate was not operative on ratification would contradict the only Senate history that's in the record, and that is that this treaty certainly became the law of the land on ratification. Well, that's true. It's the center of every treaty. Well, no. I mean, it has become the law of the land. I mean, those are the terms that are used to describe generally what treaties are. I think what the government has argued here is that this treaty did not become the law of the land, but it was only an international obligation. The Constitution is also the law of the land, but there are provisions in the Constitution that are not decisional. Right. And if something is law, it doesn't mean it's decisional in order to free courts. Right. I'm only addressing right now the self-executing question as opposed to the political question. Okay. I would also like to direct the court's attention to the Japan whaling case which counsel mentioned. In particular, please note that the relief requested by the plaintiffs there was an injunction against the executive to negotiate with Japan. They wanted an order saying that the executive could not negotiate with Japan any different whaling quotas. It was specifically the limit on the negotiating power under Article II, and that did not transform the legal analysis into a political question. So the fact that this injunction is sought does not transform the case into a political question. Additionally, the word undertakes, this was alluded to earlier in Medellin, was found to be more general, and that makes complete sense because the United States was undertaking in Article 94 of the UN Charter to comply with ICJ judgments, but our executive in the United States does not have the power to change state criminal law remedies. So it makes sense that that would require additional legislation because the executive lacks that power, but the executive distinctly has the power to negotiate. So, and the government has never put this forward, it does not make sense to say that you need legislation to empower the executive to negotiate because the executive has that power and is distinct from the Medellin holding. The review conferences that counsel alluded to that occur every five years do not satisfy the Article VI obligation to negotiate in good faith. In response to an earlier question about what additional evidence you would see, you would see declarations on that point. It has never been suggested that the Article VI obligation to negotiate in good faith can be satisfied by showing up to review conferences every five years. I'd like to go back to your question about your statement, though, even if it's not self-executing in good faith. I mean, nothing would preclude, if the United States signs an agreement that ends up in an international treaty and it has a good faith obligation and whether it's self-executing or not, nothing would preclude the executive from negotiating. Nothing would preclude the executive. So it doesn't matter what the executive might want to do, whether it's self-executing or not, right? I would disagree with that because the doctrine of self-execution revolves around whether a treaty provision is operative, whether it operates with respect to the party before the court. This provision, Article VI, certainly operates. There is no third party coming in here and saying, I claim third party rights under this treaty and that promise operated to protect me, therefore I can be here. That's why that doctrine has never been extended to a treaty party. For example, in the Washington v. Washington fishing case, this is a 1974 Supreme Court case, I believe it's in the papers, the United States filed an action against the state of Washington seeking declaratory and injunctive relief on the meaning of a treaty. It was a treaty with an Indian tribe. The United States had standing to go in and seek that declaratory relief and that injunction. And also, initially, that case was a treaty with Canada, and the court had to decide whether that treaty affected the treaty with the Indian nation. And there's no issue of self-execution there because it's a treaty party coming in to enforce the treaty right. Thank you. Thank you both, counsel, both for your briefing and for your argument. It's been a difficult case, and also, counsel, there have been multiple submissions that may be displeased. The case just argued is submitted.
judges: McKeown, Bybee, Mollway